IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| SHELLY D. WRIGHT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 08-3147-CV-S-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in September 1966, has earned her GED, and has prior work experience as a cashier. She alleges she became disabled on October 16, 2005, due to a combination of diabetes, arthritis in her back, hands and knees, bipolar disorder, depression and anxiety. While her alleged onset date is in October 2005, records from before that date help present a full understanding of Plaintiff's condition in the relevant time period.

Plaintiff lived in California when she filed her application, and had been seeing Dr. Haghbin at Sutter-Yuba Mental Health Services since at least some time in 2003. In January 2004 Plaintiff came in to obtain a refill of her Paxil prescription and reported being depressed and tired. The doctor's notes indicate Plaintiff was experiencing environmental stressors and had been drinking. R. at 209. She missed her February appointment, R. at 208, and in April reported feeling "a lot of anger," a desire to be alone, and difficulty dealing with her children and husband. She had not taken her

medication for several months and expressed "plans to look for a job [and] get her own place." R. at 207. In June she reported feeling depressed and hallucinating; she also acknowledged she had been using methamphetamine. R. at 204.[1]

While in California, Plaintiff received treatment for her physical ailments at the Live Oak Family Care Clinic. In July 2003, an MRI revealed mild disc space narrowing indicative of discogenic disease at L4-5 and "probably" L5-S1. R. at 293. In January 2004 Plaintiff reported a variety of ailments (e.g., stress, dizziness, lightheadedness, and nausea) and admitted to using "street drugs the last few months." Plaintiff weighed 274 pounds and was determined to be morbidly obese. R. at 264. On March 17, Plaintiff complained of pain in her left knee; at this time she weighed 283 pounds. R. at 261. An MRI was performed on her right knee in November 2004 that was "essentially normal, although there are some very subtle changes indicating early degenerative disease." R. at 258. In November, Plaintiff also told her doctor that she had stopped using methamphetamine and planned to remain clean; her weight at the time was 283 pounds. R. at 257.

In February 2005, the doctor noted that Plaintiff had a "very large belly pulling on low back;" at the time, she weighed 287 pounds. R. at 255. In September 2005 she complained the pain and stiffness was increasing and that Tyleonol was not helping. R. at 254. Later that month she hit her left knee on a table, causing her knee to buckle on several occasions. She was diagnosed as suffering from knee strain, arthritis, obesity and diabetes. R. at 251, 253. An MRI revealed "[M]ild medial compartment joint narrowing with mild degenerative changes." R. at 252. In October 2005, she reported falling on several occasions due to problems with her knee. Swelling and limited range of motion was noted. R. at 250. An MRI of her back revealed the same early discogenic disease noted in prior exams; otherwise, the results were normal. R. at 249.

---

[1]On another occasion, Plaintiff also admitted to using methamphetamine and marijuana "daily when available" between 2001 and 2004. R. at 202.

2

Plaintiff returned to Sutter Yuba Mental Health Services on February 23, 2006, complaining of mood swings, depression, anger, marital conflict, and suicidal thoughts. Her GAF score was assessed at 46; she was referred to therapy, prescribed Effexor, and an appointment with Dr. Haghbin was set. R. at 201-03. On March 20, Dr. Haghbin assessed Plaintiff's GAF at 50 and continued Plaintiff's prescription. R. at 198.

Between the two visits described in the preceding paragraph, Plaintiff underwent a consultative psychological evaluation performed by Dr. Timothy Canty. She told Dr. Canty she had been depressed "most days for the last two or three years" due to "recent marital problems and chronic health concerns." She had not received treatment from 2004 until her recent visit February 2006. Based on his tests, he assessed her GAF at 70, noting that "her mood problems are connected to stressful life circumstances and do not reflect a major psychiatric disorder or condition." He further declared Plaintiff would not "have significant psychiatric difficulty attending work that she could do physically." R. at 167-70.

In April 2006, Dr. Mustafa Ammar performed a consultative physical examination. He noted Plaintiff demonstrated a decreased range of motion in the spine, left knee and both hips. "Also, the examination is significant for obesity." There was no evidence of muscle spasms or atrophy. Dr. Ammar opined that Plaintiff could stand or walk a total of six hours a day with frequent breaks, sit up to six hours a day, and did not need any assistive devices. He also believed Plaintiff could lift twenty pounds occasionally and was limited in her ability to bend, stoop and crouch. R. at 192-95.

Plaintiff submitted to a consultative examination performed by Dr. Corazon David in May 2006. Dr. David concluded Plaintiff could lift twenty pounds occasionally and ten pounds regularly, stand for six hours in an eight hour day, and sit for six hours in an eight hour day. R. at 213-23.

Plaintiff underwent arthroscopic surgery on her left knee in June 2006 to repair a torn meniscus. The surgeon noted the procedure might relieve Plaintiff's symptoms (including pain), but that "weight loss would greatly benefit her knees. She weighs upwards of 290 pounds, which is putting considerable stress on the knee joints." R. at 231-32.

3

In January 2007, Plaintiff sought treatment from Dr. Donald McGehee. Plaintiff told Dr. McGehee she had been using methamphetamine and marijuana as recently as the last three months, and he found she exhibited "symptoms of a thought disorder. She described hallucinations and delusions. Also noted were flight of ideas, derailments, and obsessions." Based on tests administered, Dr. McGehee concluded Plaintiff was "severely depressed with strong feelings of helplessness, hopelessness, worthlessness, inadequacy and insecurity. . . . She is chronically angry and can express that anger either through physical or verbal violence. Her thought processes are distorted and she has very poor contact with reality." He assessed her GAF at 31. R. at 322-24. Dr. McGehee later completed a Medical Source Statement - Mental ("MSS-M") indicating Plaintiff was markedly limited in her ability to understand and remember detailed instructions, maintain attention and concentration for extended periods of time, maintain a schedule, work without supervision, work with others, or set goals or make plans independently of others. He also indicated Plaintiff is moderately limited in her ability to interact appropriately with the public or respond appropriately to changes in the workplace. R. at 399-400.

A psychologist – Elissa Lewis – reviewed Plaintiff's records in April 2007 and concluded Plaintiff was markedly limited in her ability to carry out detailed instructions and interact with the public. She also concluded Plaintiff was moderately limited in her ability to get along with co-workers, understand and remember detailed instructions, or work in proximity to others. Dr. Lewis wrote that Plaintiff "can learn at least simple and moderately complex [tasks], but probably would have difficulty sustain[in]g concentration, persistence and pace on jobs beyond the lower level of SVP of moderately comple[x] asks. She also would do best in jobs and settings with somewhat limited [social] demands. She can adapt to such jobs/settings." R. at 342-44.

In May 2007 Plaintiff went to Bridges Medical Services for the first time to obtain treatment. She reported her knee was more painful following the surgery and that she had not taken her diabetes medication since November 2006. Her weight at this time was 263 pounds. R. at 362-65. Plaintiff was referred to an orthopedist, and she saw Dr. John Huffman on August 14, 2007. Plaintiff reported needing to use a cane due to

4

pain and instability in her knee. Dr. Huffman noted "exquisite tenderness" in the patella, and x-rays revealed spurring. Plaintiff rejected an offer of injections, and Dr. Huffman provided Celebrex and told Plaintiff to take chondroitin and glucosamine. R. at 395-96.

Plaintiff returned to Dr. Bridges on August 20, 2007, and told her "[s]he is still having a lot of pain. She is doing better on celebrex that was prescribed by Orthopedics." Dr. Bridges provided diet and exercise counseling. R. at 357. On that same day Dr. Bridges completed a Medical Source Statement - Physical ("MSS-P"), indicating Plaintiff could lift ten pounds frequently and fifteen pounds occasionally, stand or walk less than fifteen minutes at a time and less than hour per day, sit continuously for forty-five minutes at a time and one hour per day, and would need to lie down two to three times a day for an hour each time due to pain. Dr. Bridges also indicated Plaintiff could never stoop, kneel, crouch, or crawl, and her medications might cause fatigue. R. at 348-49.

The administrative hearing was held on October 30, 2007. Plaintiff explained that she did not agree to the injections suggested by Dr. Huffman because they were expensive and apparently not covered by Medicaid. R. at 425. Plaintiff testified she uses a cane because of pain in her knee, which will occasionally buckle. R. at 424. The pain is constant, and rates between five and seven-and-a-half on a scale of one to ten; her back is also in pain and it rates between seven and nine. The pain is sufficiently severe to keep her from sleeping. R. at 427. On occasion, her knees "give out" or she gets "a really bad pinch" in her back, causing her legs to go numb. Sometimes, she falls as a result. R. at 429. She suffers from anxiety, which causes her to get shaky, have difficulty breathing, and makes her nauseous. She also suffers from panic attacks and claustrophobia. R. at 430-31. Plaintiff reported difficulty keeping her blood sugars in check, which also affects her mood. R. at 435-36.

The ALJ elicited testimony from a vocational expert ("VE"). In the first hypothetical posed by the ALJ, the VE was asked to assume a person of Plaintiff's age, education, and vocational background who is limited to sedentary work and needed to avoid climbing, exposure to heights, machinery, exposure to extremes of cold and humidity, and needed simple, repetitive instructions. The person is also limited to work

that does not involve contact with the public or jobs involving teamwork. The VE testified that such a person could not perform their past work, nor could such a person perform the full range of sedentary work. However, there were sedentary jobs such a person could perform, including table work, and final assembler. R. at 446-49. The ALJ then added a requirement that the person used a cane when walking, and the ALJ testified this would not change her opinion. R. at 449-50. In response to questioning from Plaintiff's attorney, the VE testified a person limited in the manner described in Dr. Bridges' MSS-P could not perform work in the national economy. R. at 450-51. The VE also testified that a person limited in the manner described in Dr. McGehee's MSS-M could not perform work. R. at 451-52.

The ALJ found Plaintiff's testimony about the effects of her pain and other limitations was not fully credible. In discounting her mental complaints the ALJ noted Plaintiff hardly sought or received treatment, suggesting the ailments were not as severe as described. The sparse records submitted suggested Plaintiff's problems were the results of situational pressures and stress as opposed to ongoing medical/mental issues. Similarly, the records regarding Plaintiff's back and knee did not reflect serious symptoms or difficulties – at least, not until the administrative hearing drew near. The ALJ found Plaintiff was limited in the manner described in the first two hypothetical questions, and based on the VE's testimony determined Plaintiff could perform work in the national economy.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final
6

decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A.

Plaintiff first contends the ALJ erred in determining her degenerative disc disease was not "severe" at the second step of the five-step analytical process. "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). The claimant must demonstrate the impairment is more than minimal; while this is not an onerous burden, "but it is also not a toothless standard . . . ." Id. at 707-08.

Here, there was substantial evidence that Plaintiff's early degenerative disc disease – which undeniably exists – imposed minimal limitations and hence was not severe. Plaintiff's back pain began in 1986 and persisted while Plaintiff worked and was not the reason Plaintiff stopped working. Nothing suggests her pain worsened over time, and complaints about her back are conspicuous by their absence from any doctor's reports.

### B.

Plaintiff next argues the ALJ did not properly evaluate the evidence, particularly her own complaints of pain and the opinions of her doctors. The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

7

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
>> 1. The claimant's daily activities;
>> 2. the duration, frequency and intensity of the pain
>> 3. precipitating and aggravating factors;
>> 4. dosage, effectiveness and side effects of medication;
>> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). In this case, it is hard to discern exactly who should be regarded as a treating physician, much less determine whether any such opinion is entitled to deference. "The treating physician rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians."

8

Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) (citation omitted). At the time of the hearing, and as far as the record reveals, Dr. McGehee saw Plaintiff on one occasion and Dr. Bridges saw Plaintiff twice. Their limited contact and involvement in Plaintiff's treatment does not justify deference to their opinion. Moreover, there is no principled reason to conclude the ALJ was obligated to accept their opinions over other doctors, such as Dr. Haghbin, Dr. Canty, or the doctors at Live Oak Medical Clinic.

While it may be a close question, the ALJ's factual determinations are supported by substantial evidence in the record as a whole. With respect to Plaintiff's mental/psychological impairments, the ALJ noted uncertainty as to when Plaintiff stopped using illicit drugs. On several occasions she claimed to have stopped in 2004. However, in her January 2007 visit to Dr. McGehee she admitted to having used street drugs in the last three months. Disability cannot be based on the effects of illegal drugs, and the record does not clearly indicate when Plaintiff stopped using methamphetamine. In addition, Plaintiff's anxiety was caused, at least in part, by her uncontrolled blood sugars. Plaintiff failed to use her diabetes medication for extended periods of time, including the six months before seeing Dr. Bridges. A condition that can be alleviated through available treatment does not constitute a disability. Finally, much of Plaintiff's stress and anxiety is related to events in her life, such as difficulty with her husband and children. She also testified that moving from California in November 2006 contributed to her anxiety. R. at 430-31. While undoubtedly true, reaction to situational stressors does not signal a medical/mental condition that is likely to last for more than a year.

The Court also notes Plaintiff was advised on numerous occasions to lose weight – not only because of her diabetes, but also because of the effect her obesity had on her knee. Plaintiff's weight at the time of the hearing was 253 – indicating Plaintiff had made some progress in this regard, but her failure to follow her doctors' advice for a period of years is telling because the failure to follow a physician's advice is inconsistent with complaints of disabling pain. E.g., Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006). Plaintiff's complaints are inconsistent with the objective medical evidence in the record.

9

## III. CONCLUSION

The Court, or another finder of fact, may have come to another conclusion. However, the ALJ is the finder of fact, and the Court's sole role is to determine whether his findings are supported by substantial evidence in the record as a whole. The Court concludes such support exists, and the Commissioner's final decision is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: January 15, 2009   UNITED STATES DISTRICT COURT